2008-NMCA-084

186 P.3d 908

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Shishmon BAILEY, Defendant–Appellant.**

No. 26,500.

Court of Appeals of New Mexico.

March 27, 2008.

Certiorari Denied, No. 31,055,
May 14, 2008.

Gary K. King, Attorney General, Santa Fe, NM, Max Shepherd, Assistant Attorney General, Albuquerque, NM, for Appellee.

John Bigelow, Chief Public Defender, Karl Erich Martell, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

WECHSLER, Judge.

{1} Defendant Shishmon Bailey appeals his convictions for abandonment or abuse of a child, bribery or intimidation of a witness, and possession of marijuana. On appeal, Defendant argues that (1) the district court erred in refusing to suppress in-custody statements made in violation of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) because the statements were made in response to questions posed by a law enforcement interviewer after Defendant expressed doubt about answering any further questions without having a lawyer present; (2) the district court erred in failing to find that the State struck three prospective jurors on the basis of race; (3) the district court erred in enhancing Defendant's sentence; and (4) cumulative error deprived Defendant of fair proceedings. We affirm Defendant's convictions.

## BACKGROUND

{2} The charges against Defendant arose after he allegedly struck his young stepson in the course of disciplining him. Defendant's wife, the boy's mother, called the police and Defendant's probation officer to report the incident, informing them that there was probably marijuana and drug paraphernalia in a shed behind the family home. Officer Hal Alton and another police officer went to Defendant's home with Defendant's probation officer to investigate. After placing De-

fendant in handcuffs, the officers found marijuana residue and drug paraphernalia in the shed as well as marijuana plants growing in the yard. In response, Officer Alton read Defendant his *Miranda* rights, which he indicated he understood, and took him from his home to the Department of Public Safety for further questioning.

## WAIVER OF *MIRANDA* RIGHTS

{3} In order to protect a defendant's right against self-incrimination, law enforcement officers must, before beginning questioning, inform a person in custody (1) of the right to remain silent, (2) of the prospect that any statement made may be used as evidence against him or her, and (3) of the right to an attorney. *Id.* at 444, 86 S.Ct. 1602, 16 L.Ed.2d 694. However, any of those rights may be waived, "provided the waiver is made voluntarily, knowingly and intelligently." *Id.; accord State v. Martinez,* 1999–NMSC–018, ¶ 13, 127 N.M. 207, 979 P.2d 718.

{4} When a defendant moves to suppress statements allegedly made in violation of *Miranda,* "the State bears the burden of demonstrating by a preponderance of the evidence that the defendant" made such a voluntary, knowing, and intelligent waiver. *Martinez,* 1999–NMSC–018, ¶ 14, 127 N.M. 207, 979 P.2d 718. In doing so, "[t]he State must demonstrate that the waiver of rights was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and also must show that the waiver "was made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (internal quotation marks and citation omitted). We review whether such a waiver was made by evaluating "the totality of the circumstances and the particular facts, including consideration of the mental and physical condition, background, experience, and conduct of the accused, as well as the conduct of the police." *Id.* (internal quotation marks and citation omitted). Additionally, we must indulge every reasonable presumption against waiver. *Id.* In doing so, "we review the trial court's findings of fact for substantial evidence and review de novo the ultimate determination of whether a defendant validly waived his or her *Miranda*

rights prior to police questioning." *State v. Barrera*, 2001–NMSC–014, ¶ 23, 130 N.M. 227, 22 P.3d 1177.

{5} Defendant argues that his Fifth Amendment rights under *Miranda* were violated when Officer Alton continued to question him after he expressed doubt about continuing without an attorney present. At the suppression hearing, Officer Alton testified that he did not re-read Defendant his *Miranda* rights at the beginning of the interview at the Department of Public Safety but that he asked Defendant (1) if he was still aware of the rights that he was read at his home and (2) whether he was willing to answer some more questions. Initially, Defendant did not object to answering Officer Alton's questions. Defendant proceeded to speak with Officer Alton, and at one point during the interview, Defendant told him that he had spanked his stepson with a toy tennis racquet and that he may have been "overzealous." Officer Alton testified that upon being asked to clarify what he meant by "overzealous," Defendant stated that he did not think that he should answer any further questions without having a lawyer present. Officer Alton asked Defendant whether he meant that he did not want to answer any more questions at all or if he was exclusively referring to questions specifically regarding the incident involving the toy tennis racquet. In response, Defendant agreed to answer questions about other topics. Officer Alton testified that he proceeded to ask Defendant questions, including questions regarding other times that he had struck his stepson.

{6} Officer Alton testified that Defendant returned to the topic that initially caused him to inquire about an attorney after he was asked, "Is there anything else you need to tell me?" At that point, Defendant stated that he had lied about spanking his stepson with the toy tennis racquet. Officer Alton testified that Defendant acknowledged that he did not use a toy tennis racquet to strike his stepson; rather, he used a wooden ski from a NordicTrack exercise machine. Defendant told Officer Alton that he struck his stepson after the child refused to answer him, that he did not hit the child too forcefully, and that he did not think that he had

bruised the child. On cross-examination, Officer Alton agreed that, despite having originally inquired about speaking with an attorney when presented with questions on the issue, Defendant ultimately told him everything about the incident. Finally, Defendant testified that when Officer Alton asked him if they could talk about anything else, he thought that the line of questioning would shift to a topic that was not related to the child abuse allegation, such as the marijuana that had been found.

{7} An audio recording of portions of Officer Alton's interview with Defendant was ultimately admitted into evidence at trial and played for the jury. As transcribed in Defendant's brief, the following exchange took place concerning Defendant's assertion that he did not want to answer any further questions about the spanking incident:

Officer: What do you mean, you got overzealous?

Appellant: I don't think I should say anything else without seeing a lawyer. It's not that I don't trust you. It's not that I'm saying that; but you can't (inaudible), right?

Officer: Yes, I can. I've already read you your rights. You said that you understood them. Okay, so, so you don't want to say any more. You don't want to say any more about that incident, or you don't want to say anything else, about ... ?

Appellant: About that incident.

Officer: Okay. All right. Having your rights in mind, can we talk about *other* disciplinary issues in the home?

Appellant: Let me, what I ...

Officer: I mean, what you're saying is that you don't want to say any more to me about that incident without a lawyer being present. I fully understand you that (Sic). I won't ask you any more questions about that incident. I'm also asking you if you're invoking your rights under *Miranda* to not talk to me about other things?

Appellant: Other things, we can talk about.

{8} After considering Defendant's *Miranda* argument, the district court ruled that Defendant's statements about not saying

anything else without first speaking with an attorney amounted to a limited invocation of his right to remain silent, that Defendant understood his rights, and that the subsequent statements about how he disciplined his stepson were voluntary. We agree.

{9} In *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the United States Supreme Court set forth the general rule regarding further questioning after an accused has requested counsel: "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." The Court went on to hold that an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378. However, *Edwards* left open the question of how law enforcement officers should respond when the suspect being questioned makes an equivocal request for counsel, as in the present case.

{10} In *Davis v. United States,* 512 U.S. 452, 455, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the United States Supreme Court addressed a situation in which the defendant stated, more than an hour after an investigating agent began interviewing him, " 'Maybe I should talk to a lawyer.' " The agent later testified about what happened after the defendant made that statement: "[We m]ade it very clear that we're not here to violate his rights, that if he wants a lawyer, then we will stop any kind of questioning with him, that we weren't going to pursue the matter unless we have it clarified is he asking for a lawyer or is he just making a comment about a lawyer, and he said, [']No, I'm not asking for a lawyer,' and then he continued on, and said, 'No, I don't want a lawyer.' "
*Id.* (alterations in original). Noting the two layers of protection afforded by *Miranda*

and *Edwards,* the Court was "unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer," and it held that "[u]nless the suspect actually requests an attorney, questioning may continue." *Davis,* 512 U.S. at 462, 114 S.Ct. 2350. The Court further noted that the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney," *id.* at 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 and observed that

> when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney.... Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel. But we decline to adopt a rule requiring officers to ask clarifying questions.

*Id.* at 461, 114 S.Ct. 2350, 129 L.Ed.2d 362.

{11} In the present case, Defendant's response, "I don't think I should say anything else without seeing a lawyer," contains two levels of equivocation. First, the statement was equivocal on its face in that Defendant did not explicitly assert that he required a lawyer before he would answer any further questions. Rather, Defendant's statement could reasonably have been interpreted to mean that he was considering whether he needed a lawyer but had not yet decided to demand one. At a minimum, the statement appears to call for a follow-up clarification question, such as, "Are you asking for a lawyer?" Second, Defendant's statement was equivocal under the circumstances because its intended scope was not clear. Although Defendant's assertion that he did not think that he should say "anything else" could be taken to mean that he did not want to say anything further on any subject, under the circumstances it was reasonable for Officer Alton to be uncertain whether Defendant

did not want to talk about the details of what he meant by using the word "overzealous," which was the immediate topic of discussion, or whether he referred to any further discussion of any kind. By asking a clarifying question, Officer Alton observed the "good police practice" recommended by *Davis* to establish exactly what Defendant wanted. *See id.*

{12} Defendant does not dispute the facts that (1) he was given *Miranda* warnings at his home and (2) he was reminded of those warnings before questioning resumed at the Department of Public Safety. Under those circumstances, Officer Alton was under no obligation to interpret, without further clarification, Defendant's equivocal statement that he was unsure whether he "should say anything else without seeing a lawyer" as a sufficiently clear invocation of his right to require all questioning to cease. On the contrary, Defendant's decision to continue answering questions and, in response to an open-ended question, to volunteer statements about the subject that had initially triggered him to equivocally invoke his *Miranda* rights constituted a knowing, intelligent, and voluntary waiver of those rights. Accordingly, the district court did not err in denying Defendant's motion to suppress the statements that he made after he suggested that he might want to speak with a lawyer before continuing the interview with Officer Alton.

## THE STATE'S USE OF PEREMPTORY CHALLENGES

{13} Defendant also argues that the State's use of all three of its peremptory challenges to excuse potential jurors with Hispanic surnames violated the principles set forth in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Batson,* the United States Supreme Court held that "[p]urposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Id.* at 86, 106 S.Ct. 1712, 90 L.Ed.2d 69. Accordingly, "by denying a person participation in jury service on account of his race, the State unconstitutionally discrim-

inate[s] against the excluded juror." *Id.* at 87, 106 S.Ct. 1712. *Batson* principles apply in cases in which, as in the present case, the excluded jurors and the defendant are apparently of different races. *See Powers v. Ohio,* 499 U.S. 400, 402, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) ("[W]e hold that a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded jurors share the same race."). In the present case, Defendant is African–American, and the excluded potential jurors, whose individual races are not discernible from the record, have Hispanic surnames.

{14} This Court has stated that in alleging a violation of the principles set forth in *Batson,* "[a] defendant must first make a prima facie showing that the State used its peremptory challenges in a racially discriminatory way." *State v. Martinez,* 2002–NMCA–036, ¶ 10, 131 N.M. 746, 42 P.3d 851. A prima facie showing requires a defendant to prove "that (1) the State exercised its peremptory challenges to remove members of [a racial] group from the jury panel and (2)[the] facts and other related circumstances raise an inference that the State used its challenges to exclude members of the panel solely on account of their race." *Id.* ¶ 11. If a defendant is able to make a prima facie showing that the State used its peremptory challenges in a racially discriminatory way, "then the State must provide a racially neutral explanation for its challenges. If the trial court finds that the State's explanation is racially neutral, then the burden again falls on [the defendant] to show that the reason given is in fact pretext for a racially discriminatory motive." *Id.* ¶ 10 (citation omitted).

{15} This Court reviews a district court's factual findings regarding a *Batson* challenge using a deferential standard of review, as it is the responsibility of the district court to (1) "evaluate the sincerity of both parties," (2) "rely on its own observations of the challenged jurors," and (3) "draw on its experience in supervising voir dire." *Martinez,* 2002–NMCA–036, ¶ 20, 131 N.M. 746, 42 P.3d 851. However, we are not required to defer to the district court regard-

ing whether a stated reason for a challenge is constitutionally adequate; therefore, we apply a de novo standard of review to the ultimate question of constitutionality. *See State v. Jones*, 1997–NMSC–016, ¶ 11, 123 N.M. 73, 934 P.2d 267.

{16} The present case bears certain similarities to our Supreme Court's decision in *Jones*. In that case, the defendant alleged that the state did not provide an adequate reason for its peremptory challenge of an African–American venire member. *Id.* ¶ 2. The state responded by asserting that it peremptorily challenged the juror " 'because he absolutely failed to establish eye contact with the [s]tate during questioning, and in the [s]tate's amateur psychological opinion, seemed not to be possessed of a certain degree of assertiveness which the [s]tate prefers to have in jurors.' " *Id.* The Court concluded that "the prosecutor's subjective belief was not a legally insufficient explanation for a peremptory challenge of the juror." *Id.* ¶ 11.

{17} In the present case, after the State used its three peremptory challenges on jurors Vigil, Garnand, and Herrera and Defendant invoked *Batson*, the district court asked if the State had a "legitimate nondiscriminatory reason" for the challenges. The district court therefore implicitly found that Defendant had made a prima facie showing that the State's challenges were racially motivated. *See Martinez*, 2002–NMCA–036, ¶¶ 10–11, 131 N.M. 746, 42 P.3d 851. As to venire member Vigil, the prosecutor stated that she had responded to only one of the State's questions, she was only twenty years old, and she did not have any children. Therefore, the State argued, Vigil gave no indication "that she would know anything about disciplining children." As to venire member Garnand, the State stated that it had not recognized the name Garnand as being Hispanic. The State further argued that Garnand was generally unresponsive to its questions during voir dire. Finally, as to venire member Herrera, the State asserted that "[t]here was absolutely no response from her at all on any of the questions."

{18} In denying Defendant's *Batson* challenge, the district court noted that a substantial percentage of the population of the local community had Hispanic surnames and that, as a statistical matter with a panel of forty-eight potential jurors, it was not out of the ordinary that all three challenges included members of that subgroup. However, in its oral ruling, the district court stated that "some of the State's reasons were somewhat vague" and possibly "approach[ed] the line of being too inexact." Although the district court did not expressly give credence to the State's assertion that it had not realized that Garnand was a Hispanic name, it found it "interesting" that the State had excused an individual whose one answer was that he had affiliations with both the chief of police and the judge presiding over the trial. The district court observed that it seemed that the State would want such a juror to be on the panel.

{19} While we agree with the district court that the prosecutor's stated reasons for the challenges were somewhat vague, at least as to Garnand and Herrera, we note that those potential jurors' alleged unresponsiveness was not much different from the challenged venire member's failure to make eye contact in *Jones*. *See Jones*, 1997–NMSC–016, ¶ 2, 123 N.M. 73, 934 P.2d 267. As in *Jones*, the stated reasons were both racially neutral and specific, thus necessitating step three of the *Batson* analysis, which shifts the burden back to the defendant "to show that the reason given [was] in fact pretext for a racially discriminatory motive." *Martinez*, 2002–NMCA–036, ¶ 10, 131 N.M. 746, 42 P.3d 851.

{20} After hearing the State's reasons for the three challenges, the district court proceeded to shift the burden back to Defendant to show that the State's challenges were pretext for a racially discriminatory motive. When asked for reasons as to why the State's reasons were pretextual, Defendant addressed the vagueness of the State's assertion of unresponsiveness, argued that the State had not specifically questioned the three potential jurors at issue at length, and suggested that the State was at least partially at fault for the lack of interaction. Those arguments added nothing significant to counter what the district court had already

implicitly decided—that the State had offered reasons that were racially neutral and specific. Therefore, the district court concluded that Defendant had not met his burden under *Batson* to show that there actually was some racially discriminatory motive.

{21} After reviewing the record, we agree with the district court's conclusion. In responding to the State's racially neutral and specific reasons for using peremptory challenges on the three jurors, Defendant failed to meet his burden of proving that the State's actual intention was racially motivated in that it aimed to ensure that Hispanic-surnamed panel members were not selected as members of the jury. Accordingly, we conclude that the district court did not err in ruling that the State's peremptory challenges complied with the mandate in *Batson*.

## ENHANCEMENT OF SENTENCE

{22} Citing *State v. Franklin*, 78 N.M. 127, 428 P.2d 982 (1967) and *State v. Boyer*, 103 N.M. 655, 712 P.2d 1 (Ct.App.1985), Defendant also argues that the district court erred in enhancing his sentence. Specifically, Defendant alleges that the State did not provide him with the correct version of the judgment and sentence on which the habitual offender enhancement was based and that, therefore, there was insufficient evidence to support the enhancement.

{23} We review the sufficiency of the evidence presented in habitual offender proceedings under a substantial evidence standard of review. *See State v. Treadway*, 2006–NMSC–008, ¶ 7, 139 N.M. 167, 130 P.3d 746. In order to support a habitual offender enhancement, the State must prove the following elements: "(1) defendant must be the same person, (2) convicted of the prior felony, and (3) less than ten years have passed since the defendant completed serving his or her sentence, probation or parole for the conviction." *State v. Simmons*, 2006–NMSC–044, ¶ 8, 140 N.M. 311, 142 P.3d 899.

{24} At Defendant's habitual offender proceeding, the State noted that the earlier conviction upon which the enhancement was based had been entered by the judge who was presiding over the current proceedings. The State requested that the court take judicial notice of the earlier proceedings. Defendant's counsel objected, arguing that the State had served upon him a judgment and sentence for the earlier offense that contained an improper extension of probation. The district court asked Defendant's counsel if his argument negated the existence of Defendant's prior felony conviction. Defendant's counsel acknowledged that it did not and stated that he simply wanted to clarify the judgment and sentence on which the State was proceeding.

{25} We understand Defendant's argument on appeal to arise from the following discrepancy. The record includes an amended judgment and sentence that was file-stamped on August 1, 2000. At the habitual offender proceeding, the district court judge, Defendant's counsel, and Defendant's probation officer discussed a judgment and sentence that was file-stamped on July 17, 2000. Both documents refer to the sentencing that took place on July 14, 2000. Although the reason for the discrepancy is unclear, Defendant does not point to any significant or relevant substantive difference between the two documents. There appears to have been full agreement that Defendant had been previously convicted of other crimes, and Defendant cites no authority for the proposition that a minor discrepancy in copies of the judgment and sentence used to prove an earlier felony conviction must result in an appellate finding of insufficiency of the evidence when the fact of the earlier conviction is not otherwise contested. *See In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984) ("We assume where arguments in briefs are unsupported by cited authority, counsel after diligent search, was unable to find any supporting authority."). Accordingly, we find Defendant's argument to be without merit.

## CUMULATIVE ERROR

{26} Finally, Defendant argues that cumulative error deprived him of fair proceedings in district court. "Under the doctrine of cumulative error, [we] must reverse a conviction when the cumulative impact of the errors [that] occurred at trial was so prejudicial that the defendant was deprived of a fair trial." *State v. Baca*, 120

N.M. 383, 392, 902 P.2d 65, 74 (1995) (second alteration in original) (internal quotation marks and citation omitted). When we conclude that no error occurred, "there is no cumulative error." *State v. Aragon,* 1999–NMCA–060, ¶ 19, 127 N.M. 393, 981 P.2d 1211. Because we have found no error in the proceedings before the district court, we conclude that there was no cumulative error in this case.

## CONCLUSION

{27} Having concluded that Defendant's rights under *Miranda* were not violated, that jury selection at Defendant's trial did not violate the principles set forth in *Batson,* and that substantial evidence supported sentencing Defendant as a habitual offender, we affirm Defendant's convictions.

{28} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and MICHAEL E. VIGIL, Judges.