This decision was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court and does not include the filing date.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

                Plaintiff-Appellee,

v.                                     **No. 31,256**

**JOHN WILLIAMS,**

                Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Neil C. Candelaria, District Judge, Presiding**

Hugh W. Dangler, Chief Public Defender
Sheila Lewis, Assistant Public Defender
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Nicole Beder, Assistant Attorney General
Santa Fe, NM

for Appellee

## DECISION

**DANIELS, Chief Justice.**

{1} Defendant John Williams was convicted of first-degree murder for the shooting death of Raymond Green, a man Defendant believed had shot and killed his childhood mentor a decade earlier. Defendant was also convicted of simple possession of a controlled substance. The issues Defendant raises in this direct appeal are (1) whether the evidence was sufficient to support the conclusion that Defendant killed with the requisite intent for first-degree murder, and (2) whether the district court erred in denying Defendant's *Batson* claim. We reject Defendant's claims and affirm his convictions.

## I. SUFFICIENCY OF THE EVIDENCE

### A. Standard of Review

{2} The test for sufficiency of the evidence "is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). Applying the sufficiency of the evidence test, "we resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 (filed 1998) ("Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject Defendant's version of the facts.").

The appellate court's role is to scrutinize the evidence and supervise "the jury's fact-finding function to ensure that, indeed, a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *State v. Baca*, 1997-NMSC-059, ¶ 13, 124 N.M. 333, 950 P.2d 776.

**B.      The Relevant Evidence**

{3}      On a Saturday night in September 2006, Defendant and his friend Bobby McKenzie drove to the downtown Albuquerque nightclub "Raw" to have drinks and socialize. The victim, Raymond Green, also went to Raw that night with a group of friends including Habib Thomas, Demetrio Lee, and Richard Ward. While at the club, Defendant was informed that Green was the man who gunned down his childhood mentor, Lamar Johnson, outside a different Albuquerque nightclub almost ten years earlier. Defendant testified he had never seen Green before that September night, but he had been apprised of details about Johnson's killer over the years. For instance, Defendant knew that the shooter's name was "Ray," he was connected to New Orleans, he had killed other people, and he had not been brought to justice for Johnson's murder.

{4}      By all accounts, Defendant did not confront Green at the nightclub. Defendant testified to having three drinks over the course of the evening. The State presented evidence that after Raw closed for the night, Defendant and Bobby McKenzie

3

followed Green and his three friends to the third floor of a nearby parking garage. Demetrio Lee testified that McKenzie's car was stationed a short distance from Lee's car and approached rapidly as Green's group attempted to enter the car. Lee claimed McKenzie's car stopped abruptly in front of his car, and Defendant immediately jumped out of the vehicle, walked quickly up to Green, pointed a handgun at Green, and asked, "Are you Ray? Are you Ray?" Lee claimed that Green pleaded, "No, man, no," and lunged for the gun, but Defendant pulled back and discharged a bullet into Green's neck. Green later died at the scene from the large amount of blood loss caused by the gunshot wound.

{5} After Green fell to the ground, Defendant picked up his cell phone that had fallen in the melee, entered the passenger side of McKenzie's car, and told McKenzie to drive. Nearby police officers heard the gunshot and intercepted the fleeing vehicle before it could leave the parking garage. After Defendant was arrested, he stated to an officer at the scene, "my friend had nothing to do with this . . . I did this myself."

{6} Defendant tendered an even more complete confession at the jailhouse. There he confessed to tricking McKenzie into taking him to the parking garage, claiming that "McKenzie . . . has nothing to do with what happened. . . . he was oblivious to the fact to what I was gonna do." He further stated, "the blood was on me. I got the blood on me man . . . ."

{7} Defendant explained in detail his reasons for killing Green. "I had to avenge my brother's death. He killed my brother ten years ago man." "I killed a killer. . . . You know I justified probably all the other bodies he done killed. . . . There's more . . . justice on the street than there is here man with you guys . . . . You guys let this guy walk around for an entire 9 years man." Defendant seemed at peace with his actions, stating, "I'm justified. In my mind, in my heart, I'll do or die man." "I'll take the murder man for real." "An eye for an eye man. You know and if I lose my life then so be it man. . . . I can sleep better at night. I can see my brother face man."

{8} At trial, Defendant gave a different explanation for his actions. He claimed that although he was devastated by Johnson's murder, he had not been trying to find the killer and had no intention of doing anything after Green's identity was revealed to him at the club. He claimed that after Raw closed for the evening and as McKenzie went to retrieve the car, Defendant started talking and walking with a childhood friend, Habib Thomas, who gave him some codeine pills. Defendant testified that after McKenzie picked him up, he tricked McKenzie into driving to a nearby parking structure by telling him they were going to "holler at some females." He claimed he tricked McKenzie so he could get more codeine pills from Thomas, not so he could exact revenge on Green.

{9} Defendant claimed that as they drove through the parking structure, he saw

5

Green and instructed McKenzie to turn around because he recognized him as the person identified as Johnson's killer earlier that evening. Once McKenzie stopped, Defendant got out and greeted Thomas, who was getting into the same car as Green. Defendant then asked Green whether he was Ray because Defendant was leery about the way Green was leaning into the car, as if to arm himself. Defendant testified that upon hearing the question, Green, a larger man, immediately rushed towards him with arms swinging. Defendant claimed that he raised the gun to defend himself, but Green grabbed it and the gun accidentally discharged during the struggle.

**C.    Sufficiency Analysis**

{10}    Defendant argues that no rational jury could have found he had the requisite intent for first-degree murder based on the evidence adduced at trial. We disagree. In New Mexico, first-degree murder includes "any kind of willful, deliberate and premeditated killing[.]" NMSA 1978, § 30-2-1(A)(1) (1994). A deliberate decision is one "arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." UJI 14-201 NMRA.

{11}    The State presented ample evidence from which a rational jury could have found Defendant deliberately killed Green. The State's eyewitnesses, Defendant's testimony, and Defendant's post-killing confessions supported findings that (1)

6

Defendant was embittered by the murder of his childhood mentor and the killer's lack of prosecution, (2) Defendant had gathered information about his mentor's killer over the past ten years, (3) that night at Raw someone informed Defendant that Green was the killer, (4) Defendant waited until Raw closed and tricked McKenzie into following Green to the parking garage to confront Green, (5) Defendant purposefully approached Green with gun drawn and asked him whether he was Ray, (6) Defendant then fired a bullet into Green's neck and killed him, (7) Defendant attempted to flee the scene of the crime, and (8) Defendant admitted to police that he killed Green to avenge his mentor's death.

{12} Although at trial, Defendant offered a new explanation for his actions, claiming that Green's death was a mixture of coincidence, self-defense, and accident, "the jury was not obligated to believe Defendant's testimony, to disbelieve or discount conflicting testimony, or to adopt Defendant's view." *State v. Foxen*, 2001-NMCA-061, ¶ 17, 130 N.M. 670, 29 P.3d 1071.

{13} Defendant cites *State v. Garcia*, 114 N.M. 269, 837 P.2d 862 (1992), in support of his sufficiency argument. "The facts in *Garcia* have been distinguished many times by this Court." *State v. Flores*, 2010-NMSC-002, ¶ 21, 147 N.M. 542, 226 P.3d 641. Despite superficial similarities, the facts are distinguishable here, as well. The *Garcia* killing was the culmination of a drunken brawl between two

friends that spanned several hours. There was no indication that Garcia had a grudge against his victim or any premeditated reason for killing the victim. In fact, it was the victim who was angry at Garcia for a previous altercation. In the present case, Defendant's motives for killing Green, to exact revenge on his mentor's killer, were established by the evidence, manifested in Defendant's actions, and candidly articulated by him in his contemporaneous admissions to the police.

**{14}** Viewing the evidence in the light most favorable to the verdict, we hold that a reasonable jury could have concluded that Defendant killed Green with deliberate intent.

## II. *BATSON* ISSUE

**{15}** Defendant argues that an African American on the jury venire was improperly excluded from serving on the jury for racially motivated reasons, contrary to *Batson v. Kentucky*, 476 U.S. 79, 89 (1986) (holding in part that the Equal Protection Clause forbids prosecutors from challenging potential jurors solely on account of their race).

### A. Standard of Review

**{16}** This Court's review of a *Batson* challenge is two-fold: First, we review the district court's factual findings using a deferential standard of review, "as it is the responsibility of the district court to (1) evaluate the sincerity of both parties, (2) rely on its own observations of the challenged jurors, and (3) draw on its experience in

supervising voir dire." *State v. Bailey*, 2008-NMCA-084, ¶ 15, 144 N.M. 279, 186 P.3d 908 (internal quotation marks and citation omitted). Second, we apply a de novo standard of review to the district court's determination as to "whether a stated reason for a challenge is constitutionally adequate." *Id.*

## B.    Background Information

{17}    The following factual findings are undisputed. Three African-American jurors were among the venire array:  Marcus Lathon, the thirteenth juror drawn; Tisha Barreiro, the twenty-sixth juror drawn; and Allan Lamb, the sixty-fifth and last juror drawn.  Mr. Lathon was struck for cause on the State's motion, and the Defendant does not challenge that ruling.  When the trial court reached the twenty-sixth juror drawn, Ms. Barreiro, the State moved to peremptorily excuse her, and the Defendant objected, stating, "I'd like to make a record that this is an African American juror." The court, believing that Ms. Barriero was the last African American on the panel, asked "the State to tell [the court] why they[ were] using a preemptory [sic] on her." The State responded that

> . . . the reason the State is striking her is because she had stated that she had been raped, she was not happy with the way A.P.D. handled the case and that she didn't think that they were sufficiently trained and that she thought they needed more training.  She had some concerns.
> I think she's had legitimate issues with A.P.D.  She indicated that they didn't arrive for a couple hours later after she had claimed the rape. She was not happy about the fact that only one investigated the case, and it seemed that she was unhappy with A.P.D.

9

And, Judge, we believe that the evidence in this case -- at least that will be tried to be raised -- is the fact that the same circumstances happened to the defendant's brother, Your Honor, in that he was murdered. No case came out of that, and that's why he took his vengeance, Your Honor.

{18} The defense countered that "basically what she said was quite innocuous. She said that she was unhappy with the A.P.D., the way that the training had been done. She had nothing against an individual officer in the case." The court initially ruled against the State, finding insufficient reasons to strike Ms. Barreiro, given that she was the only African American left on the panel and that she had made assurances "that she could be fair in spite of all of that."

{19} Once the State pointed out that Mr. Lamb was African American and was still in the venire, the court changed its ruling, stating, "I don't think the defense has established that there is a pattern here going on, so I will allow you to use a preemptory [sic]." The defense countered that it would be impossible to reach Mr. Lamb because he was the last juror drawn, but the court refused to modify its ruling. The court stated, "I think that under the law there has to be established some sort of pattern. That hasn't been established, so I'll allow them to go ahead and use the preemptory [sic]."

{20} After the parties selected the remaining jurors, without reaching Mr. Lamb, the defense and the State were allowed to perfect the record on the *Batson* issue:

10

[Defense]: Judge, just to clarify, I'm challenging the selection of the jury based on <u>Batson</u>, that the State has purposely excluded African American jurors from the panel, and my challenge is based on the fact that the jury panel consisted of only three African American jurors . . . .

[Allan Lamb was] seated in the 65th position[, which is] the last position in the jury seating chart. In essence, in order to get to Mr. Lamb, we would have to exclude all the previous jurors. I haven't done the math on it, but I'm not even convinced that if we all exercised all of our challenges, we would even get to Allan Lamb.

. . . [T]he State successfully argued over my objection for a cause removal of . . . Marcus Lathon. . . . Then they used a preemptory [sic] on what I would argue would be the only remaining African American juror, which would be . . . Tisha Barreiro . . . .

And then we would never get to the third one, Allan Lamb, because of the way he is seated in the jury panel. So this effectively excludes all African Americans from the jury, and that's our challenge.

[State]: . . . I just want to make clear that it's, first, the burden on the defendant to show a prima facie showing that there is some kind of racial issue here, Your Honor. . . .

[A]s to Mr. Lamb, if we would have got to Mr. Lamb, the State would have taken him. The State asked questions of Mr. Lamb during voir dire, and I quite frankly liked his answers to those questions, but we did not get to that, and we do not control the draw of the jurors here, Your Honor. And I think the State gives a racial neutral reason why we struck [Ms. Barreiro].

And just to add to the record, Judge, [Ms. Barreiro] also stated that some of these names sounded familiar and that she wouldn't know these people until they came into the courtroom and then she might know them. And she said she might know them by nickname, and we didn't have the nickname to respond to her about that, Your Honor. That was another reason why the State struck her.

So again, Judge, I don't believe that there is a prima facie showing at this point of the State having a pattern of discriminating based on race.

11

## C. Discussion

{21} *State v. Bailey*, 2008-NMCA-084, ¶ 14, 144 N.M. 279, 186 P.3d 908, outlines the proper three-step *Batson* procedure. Under the first step, it is the defendant's burden to show a prima facie case of discrimination by proving "that (1) the State exercised its peremptory challenges to remove members of [a racial] group from the jury panel and (2) [the] facts and other related circumstances raise an inference that the State used its challenges to exclude members of the panel solely on account of their race." *Id.* (internal quotation marks and citation omitted). Under step two, if a defendant is able to make a prima facie showing that the State used its peremptory challenges in a racially discriminatory way, then it is the State's burden to "provide a racially neutral explanation for its challenges." *Id.* (internal quotation marks and citation omitted). And finally, under step three, if the trial court finds that the State's explanation is racially neutral, then the defendant is given an opportunity to rebut by showing that "the reason given is in fact pretext for a racially discriminatory motive." *Id.* (internal quotation marks and citation omitted).

*Step One: Prima Facie Showing*

{22} In this case, the judge initially proceeded through all three *Batson* steps and ruled in Defendant's favor. Then, the judge changed his mind on the first *Batson* step and changed his ruling, on the mistaken premise that the availability of another

12

African American in the venire meant that the defense had failed to make out a prima facie *Batson* claim resulting from the State's excusal of the earlier juror.

{23}    We have never limited the showing of a prima facie case to demonstrating a clear and perfect pattern of discrimination. "This type of discrimination is deemed to be so invidious that . . . [e]ven a single instance of purposeful exclusion may establish a prima facie case of discriminatory intent." *State v. House*, 1999-NMSC-014, ¶ 84, 127 N.M. 151, 978 P.2d 967. *See also State v. Jones*, 1997-NMSC-016, ¶ 2, 123 N.M. 73, 934 P.2d 267 ("Jones objected with a prima facie showing of racial discrimination in that . . . the challenged juror was the only African-American in the venire who could serve on the jury."). In fact, a prima facie showing of discriminatory intent can be made even where the State accepted some members of the challenged racial group. *State v. Gonzales*, 111 N.M. 590, 597, 808 P.2d 40, 47 (Ct. App. 1991) ("We do not believe that the fact that some Hispanic jurors were not stricken, or the fact that the state did not use all of its peremptory challenges is determinative as to whether defendant has made a prima facie showing."). Contrary to the district court judge's belief "that under the law there *has* to be established some sort of pattern" (emphasis added), showing a pattern of discrimination is not the only way of making a prima facie case of discrimination.

There are a number of ways [a prima facie case can be made].

The important inquiry is whether defendant can point to some facts or circumstances from which a trial court could reasonably infer that the prosecution has intentionally used its peremptory challenges to eliminate jurors on the basis of their race, rather than for racially neutral reasons related to the juror's ability to fairly and impartially hear the case. Thus, the [prima facie case is made] when defendant shows that his racial group is *substantially underrepresented* or eliminated from the jury entirely. It is met when defendant shows that the case is one that is particularly susceptible to discrimination and that members of his ethnic group have been stricken by the state's use of its peremptory challenges. It is also met when defendant shows that jurors who are of the same race as defendant have been eliminated for reasons that are not applied to jurors of another race. In addition, at least one court has determined that a showing that the state used eighty percent of its peremptory challenges to strike members of defendant's racial group from the jury constitutes a prima facie showing that requires the state to articulate neutral reasons for the challenge.

*Id.* at 596, 808 P.2d at 46 (emphasis added).

{24}   In Defendant's case, the defense made a showing that Ms. Barreiro was the only African-American venire member who could serve on the jury and that the State had used a peremptory strike on her. Under our case law, the defense met the burden of step one of the *Batson* claim, because the challenged racial group was effectively eliminated from the jury entirely.

*Step Two:  Racially Neutral Reasons*

{25}   Although the district judge incorrectly found Defendant had not established a prima facie case, the judge allowed the parties to make arguments on all three *Batson* steps, enabling us to fully review the constitutionality of the State's peremptory

14

strike. Under step two, the State proffered racially neutral reasons for its use of the peremptory strike: (1) "[Ms. Barreiro] was not happy with the way A.P.D. handled" her rape case because "they didn't arrive for a couple hours" and she didn't think they "were sufficiently trained" and (2) "the same circumstances happened to the defendant's brother . . . in that he was murdered" and APD failed to identify a suspect suitable for prosecution.

{26} The State met its burden of providing race-neutral reasons for the peremptory strike. The State excluded Ms. Barreiro from the jury because of Ms. Barreiro's potential bias due to her previous interaction with APD. The State's rationale has no apparent relation to race. *See Jones*, 1997-NMSC-016, ¶ 5 ("[A] lawyer's subjective feeling about a juror may suffice for step two provided that the reason for the strike is a racially neutral, specific reason for the challenge." (internal quotation marks and citation omitted)).

*Step Three: Defense Rebuttal*

{27} "A peremptory challenge that is found to be valid on its face stands unless the defendant comes forward with a refutation of the stated reason—e.g., by challenging its factual basis—or proof of purposeful discrimination by the prosecutor." *State v. Begay*, 1998-NMSC-029, ¶ 14, 125 N.M. 541, 964 P.2d 102. The defense challenged the factual basis of the State's reasons by arguing that (1) although Ms. Barreiro was

15

unhappy with APD's training, she had "nothing against an individual officer in the case," and (2) Ms. Barreiro's rape had "[no]thing to do with the death of Lamar Johnson." We disagree with the defense's analysis. An inference could certainly be made that Ms. Barreiro would be biased against the police because she had found them inadequate in responding to her rape case in the same way Defendant found the police inadequate in responding to his mentor's murder case.

{28} The defense now argues before this Court that the State's failure to strike non-African-American venire members for bias against APD proves purposeful discrimination. Our review of the transcripts suggests otherwise. The jurors who were not struck were all jurors with strong ties to police, not jurors with negative experiences with APD. For instance, Mr. Geiger said that "if it was a close issue where one witness was not a law enforcement officer and one was, I would probably tend to give more credibility to the law enforcement officer." Mr. Gallegos said that he was affiliated with "a whole bunch" of APD officers but that he could "reasonably and fairly judge the evidence against this young man." The other jurors' contacts with police officers were even more remote, but all had positive ties to police. Rather than evincing a racially discriminatory purpose, Defendant's evidence shows the State intended to preclude jurors whose negative experiences with APD might cause bias, while keeping jurors who might favor officers. The use of peremptory strikes

16

to favor a certain disposition, so long as it is not racially motivated, is within the strategic discretion of trial counsel.

{29} Under our de novo review of the available evidence, we hold that the State proffered a race neutral reason that the Defendant did not sufficiently rebut. Although the district court judge was incorrect in his articulation of the law, the allowance of the State's peremptory strike against Ms. Barreiro was the correct result.

## III. CONCLUSION

{30} There was ample evidentiary support for the jury to find the "wilful, deliberate, and premeditated" intent required for first-degree murder, and the State's peremptory excusal of one African-American juror was constitutionally permissible. We therefore affirm Defendant's convictions and sentences.

{31} **IT IS SO ORDERED.**

_____
**CHARLES W. DANIELS, Chief Justice**

**WE CONCUR:**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**