## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Opinion Number: 2010-NMSC-028**

**Filing Date: June 15, 2010**

**Docket No. 30,967**

**STATE OF NEW MEXICO,**

      **Plaintiff-Appellee,**

**v.**

**DEMETRIO A. SALAS,**

      **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**David W. Bonem, District Judge Pro Tem**

Liane E. Kerr, L.L.C.
Liane E. Kerr
Albuquerque, NM

for Appellant

Gary K. King, Attorney General
Nicole Beder, Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

**MAES, Justice.**

**{1}** Following a jury trial,[1] Demetrio A. Salas (Defendant) was convicted of (1) first-degree murder in violation of NMSA 1978, Section 30-2-1(A)(1), (2) (1994); (2) attempted first-degree murder in violation of Section 30-2-1(A)(1) and NMSA 1978, Section 30-28-1

---

[1] Defendant was tried jointly with his co-defendant, David Griego, who is not a party to this appeal.

1

(1963); (3) shooting at a dwelling or occupied building and causing death or great bodily harm in violation of NMSA 1978, Section 30-3-8(A) (1993); (4) tampering with evidence in violation of NMSA 1978, Section 30-22-5 (2003); and (5) intimidation of a witness in violation of NMSA 1978, Section 30-24-3(A)(3) (1997). Pursuant to Rule 12-102(A)(1) NMRA, Defendant appeals directly to this Court, claiming that (1) the trial court improperly granted the State's second motion to reconsider a change of venue under NMSA 1978, Section 38-3-3 (2003) and NMSA 1978, Section 38-3-7 (1965); (2) the trial court improperly held that Defendant had violated *Batson v. Kentucky*, 476 U.S. 79 (1986) by striking a white male venireperson from the jury, but that the State had not violated *Batson* by striking Hispanic venirepersons from the jury; and (3) Defendant's convictions must be reversed under the cumulative error doctrine. We reject Defendant's claims and affirm his convictions.

## I.    BACKGROUND

{2}    At approximately 2:20 a.m. on September 15, 2005, ten-year-old Carlos Perez (Victim) was shot to death while sleeping in the bedroom he shared with his older brother, Ruben Perez (Ruben), at the Gatewood Apartment Complex in Clovis, New Mexico. Nine gunshots were fired through the boys' bedroom window, one of which struck Victim in the head, causing his death.

{3}    At trial, the State adduced the following relevant evidence regarding the shooting. On September 14, 2005, Ruben, a junior at Clovis High School, was threatened at knife point by Orlando Salas (Orlando). Orlando informed Ruben that his older brother, Defendant, wanted to fight him. It was arranged that Ruben and Defendant would fight after school. Ruben reported to the designated location for the fight, but Defendant never appeared. Ruben went home and later went to sleep in the bedroom that he shared with Victim.

{4}    That night, Defendant and Orlando picked up Melissa Sanchez (Melissa), a student at Clovis High School. Defendant was driving a white Suburban with a blue pinstripe and carrying a loaded .22 caliber revolver. Defendant drove Orlando, Melissa, and his co-defendant, David Griego, to the Gatewood Apartment Complex, where he asked Melissa to point out the apartment in which Ruben, whom he referred to as a "sewer rat," lived. Melissa complied by pointing out Ruben's apartment window.

{5}    Defendant then drove to Eric Gutierrez's (Eric) house, which was located approximately two blocks away from Ruben's apartment. Defendant ordered Orlando and Melissa to get out of the vehicle, explaining that he had to "go do some business" and that he had "a mission." Soon thereafter, Defendant and Griego returned, acting "hyped up" like "they just got a rush out of something." Defendant informed Melissa that he had just "blasted nine rounds at that sewer rat's house."

{6}    At this point, Defendant, Griego, Eric, Orlando, and Melissa heard on the police scanner that an eleven-year old boy had been shot and that the police were looking for a "white Suburban with blue lines around [it]." Defendant "started flipping out" and insisted upon parking his Suburban in Eric's garage. Melissa became upset and reached out toward

Defendant, but he informed her that she should not touch him because he had gun powder residue on him. That night and the next day, Defendant repeatedly threatened Melissa "to keep [her] mouth shut or else."

## II. DISCUSSION

### A. Whether the Trial Court Properly Granted the State's Second Motion to Reconsider a Change of Venue

**{7}** Defendant claims that, due to the public excitement and local prejudice surrounding this case, he could not obtain a fair trial in the Ninth Judicial District, which is composed of Curry County and Roosevelt County. Defendant argues that the trial court, Judge Joe Parker, therefore properly ordered a change of venue to Lea County, which is located in the Fifth Judicial District, and that Judge David W. Bonem improperly reconsidered and modified Judge Parker's order, resulting in a second change of venue to Roosevelt County in the Ninth Judicial District.

**{8}** The following additional facts and procedural history are relevant to Defendant's claim. Prior to trial, Defendant requested a change of venue, claiming that "[t]his case has received extensive publicity" and, therefore, "Defendant cannot receive a fair trial in the County of Curry, State of New Mexico, and this case should be moved to another Judicial District." Defendant suggested that venue must be changed to a neighboring county outside of the Ninth Judicial District, such as Lea or Chavez County, to preserve Defendant's right to a fair trial. Judge Parker asked Defendant whether he "[had] any numbers" to support his change of venue motion. Defendant responded that he did not have any numbers because a survey of prospective jurors would have been cost prohibitive.

**{9}** The State opposed Defendant's change of venue motion, claiming that (1) Defendant had failed to file an affidavit as required by Section 38-3-3(B), (2) the case had not received extensive publicity, and (3) Defendant had failed to produce any evidence indicating that an impartial jury could not be obtained in Curry County. Alternatively, the State argued that if a change of venue is appropriate, then the case must be moved to another county free from exception within the same judicial district, which in this case, would be Roosevelt County.

**{10}** Defendant acknowledged that it would be "somewhat easier" to choose a jury in Roosevelt County, but stated that his "instincts tell [him] real clear that people there are going to have a few percentage points less knowledge than people in Curry County." However, Defendant informed Judge Parker that he would defer to the court's discretion with respect to whether Roosevelt County is an appropriate venue.

**{11}** At the conclusion of the hearing, Judge Parker found, based on his own personal experience as a member of the community, that the case had been subject to extensive trial publicity. Judge Parker held that "justice in this matter will be better served by having the

2

jury, the jury pool selected from out of county and having this matter heard in a neighboring county." Accordingly, Judge Parker ordered venue to be changed from Curry County to Lea County.

{12}    Thereafter, the State filed a motion for reconsideration, arguing in relevant part that Defendant had "failed to produce any evidence that [he] would be deprived of a fair and impartial jury if the jurors were selected from Curry County." Additionally, the State argued that a change of venue to Lea County would impose a considerable burden on the witnesses and the family of Victim, who will have to travel from Curry County to Lea County to attend the trial. The State pointed out that, even if a change of venue is appropriate, then the case should be moved to Roosevelt County, which "[hadn't] even published an article about this [case] in a long time."

{13}    Judge Parker denied the State's motion for reconsideration, explaining:  "I'm not convinced that I'm without the appropriate discretion to change the venue. It was my opinion at that time and I haven't abandoned that opinion. . . . I'll continue in my position that this matter will be tried in Lea County." The State objected because Judge Parker had failed "to make findings on the record with regard to why we can't have [the trial] in Roosevelt County." Judge Parker found that Roosevelt County was an inappropriate venue because of "the sense of excitement about the case" and that Section 38-3-3 provides "sufficient leeway and discretion to make its findings for the trying of this case."

{14}    The State filed a second motion for reconsideration of Judge Parker's change of venue order. Thereafter, retired District Court Judge Bonem was assigned to serve as Judge Pro Tempore in this case. On August 29, 2007, Judge Bonem held a hearing on the State's motion. At the outset, Defendant clarified that the State's motion is "a motion to reconsider a ruling on a motion to reconsider" because the parties "already had the hearing on the Motion to Reconsider." The State conceded that it had previously filed a motion for reconsideration, but stated that "with all due respect to Judge Parker, [it] did not believe that the Court specifically followed the law in all of the things necessary to consider a change of venue." At the hearing, both the State and Defendant reiterated the same arguments that they previously had presented to Judge Parker.

{15}    Judge Bonem upheld "the previous ruling that the venue from Curry County shall be changed." However, according to Section 38-3-7, "where a change of venue is granted, the case shall be removed to another county within the same judicial district unless the remaining counties are subject to exception." Judge Bonem determined that Roosevelt County was not subject to exception because

> Roosevelt County has received approximately one-half (½) of the trial pre-
> trial publicity that Curry County has been subjected to. The Court further
> finds that media coverage of this case has been essentially non-existent in
> Roosevelt County in the past seven (7) months of the date of this order. The

3

Court further finds that substantial time has passed since the alleged incident in question, approximately one (1) year and eleven (11) months.

Accordingly, Judge Bonem held that "the appropriate venue of this case shall be the Ninth Judicial District, Roosevelt County."

**{16}** "This Court reviews a grant or denial of a motion for change of venue under an abuse of discretion standard." *State v. Barrera*, 2001-NMSC-014, ¶ 11, 130 N.M. 227, 22 P.3d 1177. "The trial court's discretion in this matter is broad and will not be disturbed on appeal unless a clear abuse of that discretion can be demonstrated. The burden of establishing an abuse of discretion is borne by the party that opposes the trial court's venue decision." *State v. House*, 1999-NMSC-014, ¶ 31, 127 N.M. 151, 978 P.2d 967 (citation omitted).

**{17}** Additionally, this Court will uphold the trial court's ruling on a change of venue motion if it is supported by substantial evidence. *See Barrera*, 2001-NMSC-014, ¶ 12; *House*, 1999-NMSC-014, ¶ 32.

> Substantial evidence consists of relevant evidence that might be accepted by a reasonable mind as adequate to support a conclusion. This Court resolves all disputed facts and draws all reasonable inferences in favor of the successful party and disregards all evidence and inferences to the contrary, viewing the evidence in the light most favorable to the trial court's decision. We must be mindful that it is the role of the trial court, and not the appellate court, to weigh the evidence and determine the credibility of witnesses. We do not substitute our own judgment for a determination of the trial court supported by substantial evidence.

*Barrera*, 2001-NMSC-014, ¶ 12 (citations omitted).

**{18}** We begin our analysis with a brief review of the statutes governing a change of venue motion. Section 38-3-3(B)(3) provides:

> The venue in all civil and criminal cases shall be changed, upon motion, to another county free from exception . . . when the party moving for a change files in the case an affidavit of himself, his agent or attorney, that he believes he cannot obtain a fair trial in the county in which the case is pending because . . . of public excitement or local prejudice in the county in regard to the case or the questions involved in the case, an impartial jury cannot be obtained in the county to try the case . . . .

Section 38-3-7 further provides:

> In all cases where a change of venue is granted, the case shall be removed to another county within the same judicial district unless the

4

remaining counties are subject to exception, or unless the change of venue is ordered upon any of the grounds relating to the judge. Under these circumstances, the case shall be removed to some county of the nearest judicial district which is free from exception.

To resolve the issue on appeal, we must determine whether Roosevelt County is "subject to exception" under Sections 38-3-3 and 38-3-7.

**{19}** The record reflects that Defendant failed to adduce any evidence in support of his claim that he could not obtain a fair trial in Roosevelt County. For example, Defendant failed to produce any witnesses, file any affidavits, admit any media articles, or submit any juror questionnaires exhibiting bias or prejudice. Although defense counsel represented to the court that there was extensive public excitement and media coverage surrounding this case, it is well established that "[a]rgument of counsel is not evidence." *State v. Cochran*, 112 N.M. 190, 192, 812 P.2d 1338, 1340 (Ct. App. 1991). Accordingly, the evidence was insufficient to establish that Roosevelt County was subject to exception, and Judge Bonem properly ordered venue to "be removed to another county within the same judicial district" as Curry County in accordance with Section 38-3-7.

**B.      Whether the Trial Court Properly Ruled on the Parties' *Batson* Challenges**

**{20}** We next address whether the trial court properly ruled that Defendant's peremptory strike against a white male venireperson violated *Batson*, whereas the State's peremptory strikes against Hispanic venirepersons did not. The following additional facts and procedural history are relevant to this claim. Defendant and his co-defendant, Griego, received a total of fourteen peremptory challenges to exercise against regular jurors and two peremptory challenges to exercise against alternate jurors.[2] The State received the same number of peremptory challenges.

**{21}** During jury selection, the State raised a *Batson* challenge, pointing out that Defendant had used nine of his fourteen peremptory challenges to strike "all the white males on [the] jury panel." In response, the trial court asked Defendant to supply a rational basis for the last three venirepersons struck. Defendant provided a race neutral explanation for each venireperson, after which the trial court stated that it had been "alerted to the [State's] concern and [it] will respond appropriately if the pattern continues." Shortly thereafter, Defendant exercised his tenth peremptory challenge on a white male. Defendant sua sponte proffered a rational basis for this peremptory challenge, and jury selection continued.

**{22}** Defendant subsequently exercised his eleventh peremptory challenge on Juror 19, a white male. The State renewed its *Batson* challenge. The trial court noted that "[d]uring

---

[2] Because Defendant and Griego exercised their peremptory challenges jointly, we hereinafter refer to Defendant and Griego collectively as "Defendant."

proceedings, [Juror 19 had] indicated that if the case went until the fifth he would be out on a cattle check." A discussion took place off the record, after which the trial court asked Defendant to provide a race-neutral explanation for striking Juror 19. Defendant explained:

> We based it on his questionnaire and his responses and a tactical reason. Because I don't want him as foreman on this jury. And I don't think that that has anything to do with his race, it has everything to do with his power. And the other thing, he's a crime victim.
> And counsel for co-defendant in this case - - well, the reason we think he's going to be foreman is because he's got a Ph.D., and I don't want one person controlling this jury, and he will. And that's our tactical reason, primarily that.
> And the other thing is is that, you know, I'm a rancher as well and I know what that stuff means, and I just - - if we're getting down to the last day and they're deliberating into that day or two days before, I mean, I think we'll be finished with our case, but if this case is close and they're deliberating, he's going to push this jury to a verdict. I'm not going to like the verdict.

**{23}** The State questioned the veracity of Defendant's facially neutral explanation, noting that "every single one" of the other jurors accepted by Defendant "is either a victim of a crime or has served as a juror before." In particular, the State pointed out that Defendant had accepted Juror 17, "who is a prior foreman of a jury." The State argued that Defendant's facially neutral explanation was pretext for a discriminatory motive, noting that Defendant had used all of his peremptory strikes thus far to eliminate "one hundred percent of [the] white males" from the jury.

**{24}** In response, Defendant explained that his general trial strategy was to exclude crime victims and male venirepersons with prior jury experience because he was afraid that they would end up "taking control [of the jury] because [they have] all that experience. That's a real sensitive issue for us with some of these powerful men on this jury." Defendant further explained that it had been his

> experience doing a number of trials, especially with jury panels that have been there for a long period of time, they have a tendency to favor the State after they've [served] two or three times. And it's not based on race, it's based on prior jury service and the fact that the more they serve, the more convictions the State gets.

**{25}** Defendant clarified that he was striking "powerful" men with prior jury experience because he feared that they "would end up controlling the jury, particularly against the women on the jury." Additionally, Defendant noted that "one of the key witnesses in this case is a young woman. And [he happened] to think that frankly fathers have - - don't judge the credibility of young females as well as mothers do. That's defining my strategy, it has

6

nothing to do with their race." The trial court held that Defendant had failed to provide a neutral explanation sufficient to justify the use of a peremptory challenge against Juror 19 and, therefore, struck Defendant's peremptory challenge and seated Juror 19 on the jury.

**{26}** Thereafter, the State peremptorily struck three Hispanic venirepersons: Jurors 56, 85, and 28. Defendant raised a *Batson* challenge, and the State sua sponte provided a race-neutral explanation for each: "[Juror 28] was asleep during my jury selection, so that was a concern that I had, so that's why we struck her. And [Juror 85], she - - we know her father, but I know her as being involved in crimes that I myself have prosecuted her on. So I struck her." With respect to Juror 56, the State explained that his "son and granddaughter are defendants - - or were [d]efendants in this district, and that's the reason we struck him."

**{27}** Defendant admitted that the State had provided "a valid reason for striking [the] juror[s]," but objected to the challenges because the information was "only privy to the State." Defendant argued that the State should have shared the information with the defense so that it "could have dealt with that issue. Because that changes the strategy of picking a jury for us whenever you have three people like that." In response, the State pointed out that the information was available to Defendant because it was provided in the juror questionnaires.

**{28}** Defendant complained that, in total, the State had struck "five out of eight" Hispanic venirepersons. The trial court asked the State to provide a race-neutral explanation for the two prior peremptory challenges. The State explained that it had struck Juror 51, a Hispanic female, because "she is familiar with Jonathan Carver in this case. Jonathan Carver is a witness, he's a potential witness in this case and was assisting David Griego and [Defendant] with a place to stay while he allegedly came up with what they were going to do after the homicides." With respect to Juror 57, who is also a Hispanic female, the State explained that she was struck because her uncle previously had been represented by defense counsel.

**{29}** The trial court found that the State had provided a race-neutral explanation for each of its peremptory strikes and, therefore, denied Defendant's *Batson* challenge. The trial court pointed out that the explanations provided by the State were "different than striking a person as a male, a person that would be powerful."

**{30}** It is well established that neither the State nor a defendant may "during the jury selection process, use [their] peremptory challenges to exclude otherwise unbiased and well-qualified individuals solely on the basis of their race, gender, economic status, or any other similar discriminatory characteristic." *House*, 1999-NMSC-014, ¶ 84; *see also J.E.B. v. Alabama*, 511 U.S. 127, 129 (1994) (holding that "gender, like race, is an unconstitutional proxy for juror competence and impartiality"); *Georgia v. McCollum*, 505 U.S. 42, 59 (1992) (holding that "the Constitution prohibits a criminal defendant from engaging in purposeful discrimination . . . in the exercise of peremptory challenges"). Such invidious discrimination violates the Equal Protection Clause of the United States Constitution and "causes harm to

7

the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process." *J.E.B.*, 511 U.S. at 140.

**{31}** The United States Supreme Court has adopted a three-part test to determine whether peremptory challenges have been exercised in a discriminatory manner. First, the opponent of a peremptory challenge bears the burden to establish a prima facie case indicating that the peremptory challenge has been exercised in a discriminatory way (step one). *See Purkett v. Elem*, 514 U.S. 765, 767 (1995) (per curiam). To make a prima facie showing, a party must prove that (1) a peremptory challenge was used to remove a member of a protected group from the jury panel, and (2) the facts and other related circumstances raise an inference that the individual was excluded solely on the basis of his or her membership in a protected group. *See State v. Bailey*, 2008-NMCA-084, ¶ 14, 144 N.M. 279, 186 P.3d 908; *State v. Martinez*, 2002-NMCA-036, ¶ 11, 131 N.M. 746, 42 P.3d 851.

**{32}** If the opponent of the peremptory challenge successfully makes a prima facie showing, then the burden shifts to the proponent of the challenge to come forward with a race or gender-neutral explanation (step two). *See Purkett*, 514 U.S. at 767. "The second step of this process does not demand an explanation that is persuasive, or even plausible." *Id.* at 767-68. Rather, the issue is the facial validity of the proffered explanation. "Unless a discriminatory intent is inherent in the [party's] explanation, the reason offered will be deemed race [or gender]-neutral."[3] *Id.* at 768. "If a [race or gender]-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial [or gender] discrimination." *Id.* at 767. "[T]he ultimate burden of persuasion regarding racial [or gender] motivation rests with, and never shifts from, the opponent of the strike." *Id.* at 768.

**{33}** We review the trial court's "factual findings regarding a *Batson* challenge using a deferential standard of review, as it is the responsibility of the [trial] court to (1) 'evaluate the sincerity of both parties,' (2) 'rely on its own observations of the challenged jurors,' and (3) 'draw on its experience in supervising voir dire.'" *Bailey*, 2008-NMCA-084, ¶ 15 (quoting *Martinez*, 2002-NMCA-036, ¶ 20). However, we apply a de novo standard of review to the ultimate issue of constitutionality. *Jones*, 1997-NMSC-016, ¶ 11.

## 1. Defendant's Peremptory Challenges

**{34}** The record reflects that Defendant used his peremptory challenges to strike every single white male from the jury pool. "Courts are in near universal agreement . . . that a

---

[3] However, this Court has stated that, if faced with a "silly or superstitious" explanation, it "might be inclined to consider whether the New Mexico Constitution provides more protection from discrimination than is apparently provided under the Fourteenth Amendment after *Purkett*." *State v. Jones*, 1997-NMSC-016, ¶ 9, 123 N.M. 73, 934 P.2d 267.

party's decision to strike all the members of a particular race [or gender] establishes a prima facie case of discrimination." *Martinez*, 2002-NMCA-036, ¶ 24; *see also Batson*, 476 U.S. at 97 (noting that "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination"). Accordingly, the State established a prima facie case of discrimination.

{35}   We next address whether Defendant provided a facially neutral explanation for exercising his eleventh peremptory challenge on Juror 19, a white male. Defendant explained that he struck Juror 19 because Juror 19 was a crime victim with prior jury experience. Additionally, Juror 19 had a Ph.D., which led Defendant to believe that he might become the foreperson of the jury and Defendant did not "want him as foreperson on this jury" because he might end up "controlling this jury." Additionally, Defendant was concerned that Juror 19 might "push this jury to a verdict" because of his responsibilities as a cattle rancher. The reasons proffered by Defendant were both specific to Juror 19 and facially neutral and, therefore, satisfied step two of the *Batson* test. *See Jones*, 1997-NMSC-016, ¶ 5 (holding that "challenging a juror for failure to make eye contact and lack of assertiveness is a racially neutral, specific reason," for exercising a peremptory challenge, which satisfies step two of the *Batson* test); *Bailey*, 2008-NMCA-084, ¶ 19 (holding that challenging a potential juror for unresponsiveness during voir dire is a racially neutral reason for exercising a peremptory challenge, which satisfies step two of the *Batson* test).

{36}   However, the trial court did not find Defendant's facially neutral explanation to be credible and, therefore, held that Defendant's peremptory challenge failed under step three of the *Batson* test. We conclude that the record amply supports the trial court's factual finding regarding Defendant's discriminatory motive. First, Defendant explicitly acknowledged that his trial strategy was gender motivated, stating that he was striking men in lieu of women because "fathers . . . don't judge the credibility of young females as well as mothers do," and because he thought that "an analytical woman would probably give [Defendant] a fairer shake." Second, the trial court reasonably could have found that Defendant's trial strategy was racially motivated. Although Defendant claimed that he was exercising his peremptory challenges to strike *all* male venirepersons with prior jury experience, regardless of race, the State pointed out that Defendant previously had accepted *non-white* male venirepersons with prior jury experience. Thus, the trial court reasonably could have found that Defendant's facially neutral explanation was pretextual. Accordingly, the trial court did not abuse its discretion by affirming the State's *Batson* challenge and seating Juror 19 on the jury.

### 2.      The State's Peremptory Challenges

{37}   Defendant claims that the State failed to provide a race-neutral reason for striking five out of eight Hispanic venirepersons from the jury. Essentially, Defendant claims that, if his proffered reasons were not race-neutral, then *a fortiori*, the State's proffered reasons were not race-neutral either.

9

**{38}** The State explained that it had struck Juror 28 because she fell asleep during voir dire, Juror 85 because she was involved in crimes prosecuted by the prosecutor, and Juror 56 because his son and granddaughter were defendants in the Fifth Judicial District. Additionally, the State struck Juror 51 because she was familiar with a potential witness in the case and Juror 57 because her uncle previously had been represented by defense counsel. The trial court properly found that the State's explanations were neither inherently discriminatory nor pretextual. The State focused on the answers provided by each of the venirepersons and their conduct during voir dire to provide reasonable and facially neutral reasons for their exclusion. Nothing in the State's answers alluded, either explicitly or implicitly, to the juror's gender, race, or ethnicity. Accordingly, we hold that the trial court properly rejected Defendant's *Batson* challenge.

**C.    Whether the Cumulative Impact of the Errors That Occurred at Trial Deprived Defendant of a Fair Trial**

**{39}** Lastly, Defendant claims that the cumulative impact of the trial court's erroneous rulings resulted in cumulative error, thereby depriving him of a fair trial. "The doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial." *State v. Roybal*, 2002-NMSC-027, ¶ 33, 132 N.M. 657, 54 P.3d 61. "In New Mexico the doctrine of cumulative error is strictly applied. It cannot be invoked when the record as a whole demonstrates that the defendant received a fair trial." *State v. Trujillo*, 2002-NMSC-005, ¶ 63, 131 N.M. 709, 42 P.3d 814 (internal quotation marks and citations omitted).

**{40}** There was no error in this case and, therefore, Defendant received a fair trial. Accordingly, Defendant's cumulative error claim is rejected. *See State v. Martin*, 101 N.M. 595, 601, 686 P.2d 937, 943 (1984) (holding that the cumulative error "doctrine cannot be invoked if no irregularities occurred or if the record as a whole demonstrates that a defendant received a fair trial" (citation omitted)); *State v. Casillas*, 2009-NMCA-034, ¶ 51, 145 N.M. 783, 205 P.3d 830 ("Because there was no error, . . . there was no cumulative error.").

**III.    CONCLUSION**

**{41}** For the foregoing reasons, we affirm Defendant's convictions.

**{42}    IT IS SO ORDERED.**

                                                                                          _____

                                                                                          **PETRA JIMENEZ MAES, Justice**

**WE CONCUR:**

_____
**CHARLES W. DANIELS, Chief Justice**


_____
**PATRICIO M. SERNA, Justice**


_____
**RICHARD C. BOSSON, Justice**


_____
**EDWARD L. CHÁVEZ, Justice**

**Topic Index for _State v. Salas_, Docket No. 30,967**

| | |
|---|---|
| **CA** | **CRIMINAL PROCEDURE** |
| CA-CV | Change of Venue |
| CA-CE | Cumulative Error |
| | |
| **JR** | **JURIES** |
| JR-JS | Jury Selection |
| JR-PC | Peremptory Challenges |