Certiorari Denied, January 5, 2016, No. S-1-SC-35651
Certiorari Denied, January 25, 2016, No. S-1-SC-35658

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number:  2016-NMCA-018

Filing Date:  November 23, 2015

Docket No. 33,405

ART BUSTOS, Personal Representative
for the ESTATE OF JUVENTINO HERNANDEZ,
Deceased, ODILIA PALMA DE CEBALLOS, Wife,
DENISE ALEJANDRA CEBALLOS-PALMA, Daughter,
individually, and ODILIA PALMA DE CEBALLOS, as Parent
and Next Friend of GUADALUPE CEBALLOS-PALMA and
SARAH CEBALLOS-PALMA, Minor Children,

       Plaintiffs-Appellants,

v.

CITY OF CLOVIS, CLOVIS POLICE DEPARTMENT,
OFFICERS DOUG FORD, ERIC MULLER, and
DAVID BRYANT, Individually and in their official
capacities,

       Defendants-Appellees.

**APPEAL FROM THE DISTRICT COURT OF CURRY COUNTY**
**Albert J. Mitchell Jr., District Judge**

Lindsey Law Firm, L.L.C.
Daniel R. Lindsey
Clovis, NM

for Appellants

Beall & Biehler
Gregory L. Biehler
Gianna M. Mendoza
Albuquerque, NM

1

for Appellees

**OPINION**

**VIGIL, Chief Judge.**

**{1}** This case requires us to revisit the requirements for imposing joint and several liability on the original tortfeasor when there are successive tortfeasors. We conclude that the district court erred in granting summary judgment on Plaintiffs' wrongful death claim after ruling as a matter of law that joint and several liability does not apply in this case.

**{2}** In addition, we agree with Plaintiffs that Defendants' use of peremptory challenges resulted in the unconstitutional exclusion of Hispanics from the jury, and the defense verdicts on the claims that were tried must therefore be set aside. *See Batson v. Kentucky*, 476 U.S. 79, 85 (1986) (holding that racial discrimination in the jury selection in a criminal case offends the Equal Protection Clause of the United States Constitution); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 616 (1991) (holding that a private litigant in a civil case may not use peremptory challenges to exclude jurors on account of their race).

**{3}** Finally, we summarily address Plaintiffs' remaining arguments.

**I.     BACKGROUND**

**A.     Facts**

**{4}** Juventino Ceballos Hernandez, a Mexican national with a wife and three children, came to the United States with a valid visa to Clovis, New Mexico. Mr. Hernandez stayed with friends, Cruz and Petra Chavez, their three children, and Cruz's brother Ivan.

**{5}** About one month later, Mr. Hernandez suffered from some type of episode. He was eating with the Chavez family and began yelling and pounding his fists on the table. Petra went next door to ask her neighbor, who speaks English, to call for help. The neighbor called 911 telling the dispatcher that Mr. Hernandez was going "crazy" and to please send help.

**{6}** Officers Bryant and Muller arrived at the Chavez's residence. They knocked and yelled, "police" but did not receive an answer. They heard banging and yelling, which made Officer Bryant want to investigate the possibility of a crime. The door was open, so Officer Bryant stepped inside, with Officer Muller just behind him. Officer Bryant saw Mr. Hernandez sitting at the table eating, banging on the table, and yelling. Mr. Hernandez turned around to face the officers, smiled, waved, and then continued eating, banging on the table, and yelling. However, he was not harming anything or anybody, and no violence was taking place. Mr. Hernandez did not respond to questions Officer Bryant yelled at him in English, and although Officer Bryant knew that Mr. Hernandez spoke Spanish, Officer

2

Bryant continued to yell at Mr. Hernandez.

**{7}** Suddenly, and without provocation, Mr. Hernandez ran toward the officers and punched or hit them. Officer Bryant arrested Mr. Hernandez for battery on a police officer, took him into police custody, and intended to take him to jail. The officers handcuffed Mr. Hernandez, but when they started taking him out the door, Mr. Hernandez kicked the door, and they all fell to the floor. Officers Bryant and Muller held Mr. Hernandez down on the floor until Officers Ford and Longley arrived. The officers were able to get Mr Hernandez outside after putting him in ankle cuffs and securing the ankle cuffs to the handcuffs behind him by attaching a strap or a dog leash between the ankle cuffs and the handcuffs.

**{8}** With Mr. Hernandez "hogtied" in this manner, the four officers carried or dragged Mr. Hernandez outside. Once outside of the home, Mr. Hernandez was dragged down the driveway, and he suffered abrasions on his thighs. When a witness saw the officers dragging Mr. Hernandez across the rough driveway on his thighs, she "was horrified by what they did, because it was like they were laughing like they had won." Plaintiffs presented expert testimony that restraining Mr. Hernandez with the hogtie violated police standards of care under the circumstances.

**{9}** When the ambulance arrived, Mr. Hernandez was in the middle of the driveway on his stomach. His hands were held behind him by the handcuffs, and his legs were bent at the knees, sticking up in the air. Mr. Hernandez's thighs were abraded from being dragged across the rough pavement, and he had blood coming from his mouth. The EMTs put Mr. Hernandez on a long backboard face down and loaded him onto the stretcher. On the backboard, the EMTs secured Mr. Hernandez with spider straps. Spider straps have two points at the top, two points at the bottom, and three straps across the middle that hook on each side. Officer Bryant rode in the ambulance with Mr. Hernandez as he was under arrest and in police custody. Mr. Hernandez arrived at the emergency room lying face down on the backboard with the handcuffs and ankle cuffs fastened, in addition to the spider straps. His hands and feet were tied together behind his back, his feet crossed.

**{10}** Dr. Thibodeau was in charge of Mr. Hernandez's treatment at the hospital, and she made the decision to keep Mr. Hernandez restrained with his hands and feet bound together behind his back. Her plan was to keep Mr Hernandez face down and in the restraints until he was calm and then remove the restraints. In order to calm Mr. Hernandez as quickly as possible, and get him out of the shackles, Dr. Thibodeau provided him with medications to chemically calm him down.

**{11}** After the medications were administered, Mr. Hernandez quit breathing. A nurse who was with him called a code blue, and the officers went into the room and removed the restraints. The hospital staff resuscitated Mr. Hernandez, however, he suffered brain damage and was in a vegetative state for the next seven months. His family returned him to Mexico where he subsequently died.

3

**B.    Procedural History**

**{12}**    The estate of Mr. Hernandez and his family (Plaintiffs) filed suit against the City of Clovis, the individual police officers, the hospital, and Dr. Thibodeau. Claims were made for wrongful death, negligent infliction of emotional distress, loss of consortium, battery, excessive force under 42 U.S.C. § 1983 (2012), and medical malpractice. Prior to trial, the hospital and Dr. Thibodeau settled the medical malpractice claims with the family and had no further involvement in the case. We therefore refer to the City of Clovis and the individual police officers herein as Defendants. Prior to trial the district court also granted summary judgment in favor of Defendants on the wrongful death claim and dismissed the claim for negligent infliction of emotional distress.

**{13}**    The parties went to trial on the battery, excessive force, negligence, and loss of consortium claims. The district court granted Defendants a directed verdict on the battery, and the jury found for Defendants on the remaining claims.

**{14}**    Plaintiffs appeal raising eleven issues but only brief five. The issues briefed are: (1) whether summary judgment was properly granted on the wrongful death claim; (2) whether defense counsel's peremptory strikes resulted in the unconstitutional exclusion of Hispanics from the jury; (3) whether the directed verdict on the battery claim was properly granted; (4) whether there was error in excluding the testimony of Plaintiffs' expert witness on hedonic damages; and (5) whether the verdict should be set aside due to defense counsel's statements during voir dire. We address the first two issues separately and summarily address the remaining issues, including those that were not briefed.

**II.    SUMMARY JUDGMENT ON THE WRONGFUL DEATH CLAIM**

**{15}**    Plaintiffs' wrongful death claim was based upon New Mexico tort law and for a violation of constitutional rights under 42 U.S.C. § 1983.The district court granted Defendants' motion for summary judgment on the basis that "liability on the part of the officers ends when Mr. Hernandez was delivered to the [e]mergency [r]oom." We reverse on the New Mexico tort law claim and affirm on the federal claim.

**A.    Standard of Review**

**{16}**    "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. "On appeal from the grant of summary judgment, we ordinarily review the whole record in the light most favorable to the party opposing summary judgment to determine if there is any evidence that places a genuine issue of material fact in dispute." *City of Albuquerque v. BPLW Architects & Eng'rs, Inc.*, 2009-NMCA-081, ¶ 7, 146 N.M. 717, 213 P.3d 1146. We review summary judgment de novo and we resolve all reasonable inferences in favor of the non-movant and view the pleadings, affidavits, depositions, answers to interrogatories, and admissions in a light most favorable

4

to a trial on the merits. *See Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 7, 148 N.M. 713, 242 P.3d 280. We do so because New Mexico courts "view summary judgment with disfavor, preferring a trial on the merits." *Id. ¶ 8.* "To determine which facts are material, the court must look to the substantive law governing the dispute." *Id.* ¶ 11 (internal quotation marks and citation omitted). In this case, multiple tortfeasor liability and 42 U.S.C. § 1983 are the substantive law governing the wrongful death claim.

## B. Multiple Tortfeasor Liability

{17}     Under New Mexico's pure comparative fault rules, "when concurrent tortfeasors negligently cause a single, *indivisible* injury... each tortfeasor is severally responsible for its own percentage of comparative fault for that injury." *Payne v. Hall*, 2006-NMSC-029, ¶ 11, 139 N.M. 659, 137 P.3d 599 (emphasis in original); *Gulf Ins. Co. v. Cottone*, 2006-NMCA-150, ¶ 20, 140 N.M. 728, 148 P.3d 814. Other rules apply when successive tortfeasors negligently cause separate, divisible injuries.

{18}     "As an exception to the general rule of several liability, the successive tortfeasor doctrine imposes joint and several liability on the original tortfeasor for the full extent of both injuries, those caused by both the original tortfeasor and the successive tortfeasor." *Payne*, 2006-NMSC-029, ¶ 13. For this exception to apply, the first injury is caused by the original tortfeasor and that injury causally leads to a second, distinct injury (or a distinct enhancement of the first injury), which is caused by a second tortfeasor. *Id. ¶* 12. "The original tortfeasor is responsible for both injuries because it is foreseeable as a matter of law that the original injury, such as that suffered from a car accident, may lead to a causally-distinct additional injury, such as when the original injury requires subsequent medical treatment, negligently administered at a hospital." *Id.* ¶ 13; *see also Gulf Ins. Co.*, 2006-NMCA-150, ¶ 20 (discussing elements of successive tortfeasor liability that are required to impose joint and several liability). In order for this narrow exception to comparative negligence to apply, the original injury must be "caused by the negligence of the original tortfeasor, which is then followed by a second or enhanced injury caused by the second tortfeasor." *Payne*, 2006-NMSC-029, ¶ 15. Thus, when the elements of negligence, causation, and a distinct original injury are found, the original tortfeasor may be held jointly and severally liable for the subsequent or enhanced injury as well. *Id.*; *Gulf Ins. Co.*, 2006-NMCA-150, ¶ 20.

{19}     In granting summary judgment, the district court found that "[t]he evidence does not support Plaintiffs' theory that the injuries the police allegedly caused Mr. Hernandez necessitated the allegedly negligent medical care administered to Mr. Hernandez in the emergency room." We disagree. Viewing the evidence in the light most favorable to Plaintiffs, as we must, we conclude that Plaintiffs presented evidence pointing to genuine issues of material fact on whether Defendants are jointly and severally liable for the death of Mr. Hernandez. Specifically, there are issues of material fact as to whether negligence of Defendants caused Mr. Hernandez to suffer personal injuries and whether it was foreseeable that those injuries required medical attention.

5

**{20}** Officer Bryant originally arrested Mr. Hernandez, intending to take him to jail. When efforts to take him out of the house in handcuffs failed, the officers hogtied Mr. Hernandez and carried or dragged him outside where he was dragged down the driveway and the ambulance was called. Expert testimony was presented by Plaintiffs that this violated accepted police practices. Mr. Hernandez was lying hogtied face down on the driveway with abrasions on his thighs from being dragged on the pavement and he was bleeding from the mouth when the ambulance arrived. A jury could very well conclude that it was foreseeable to the officers that Mr. Hernandez would receive treatment for these injuries at the emergency room. The evidence also supports a finding that Mr. Hernandez received negligent medical treatment at the emergency room, resulting in a cardiac arrest and death—separate and distinct injuries from those he received in the process of being arrested.

**{21}** Under the circumstances, it was up to the jury to decide, under appropriate instructions, whether Defendants were jointly and severally liable for the injuries and death suffered by Mr. Hernandez. *See Payne*, 2006-NMSC-029, ¶ 42 ("[If] causation of an original injury is contested, then it would not be appropriate for the trial judge to make this determination in place of the jury."). We therefore reverse the summary judgment granted in favor of Defendants on Plaintiffs' wrongful death claim that is premised upon joint and several liability.

### 3. Liability Under 42 U.S.C. § 1983

**{22}** The district court also concluded that the alleged negligent treatment administered at the emergency room "is the superseding cause" of Mr. Hernandez's cardiac arrest and related injuries, and because no reasonable jury could find that the conduct of the police officers "was the proximate cause" of his cardiac arrest and injuries, Defendants were entitled to summary judgment on the 42 U.S.C. § 1983 claim. Plaintiffs have not provided us with any authority demonstrating that summary judgment was improperly granted on this claim on this basis. We therefore affirm. *See State v. Godoy*, 2012-NMCA-084, ¶ 5, 284 P.3d 410 ("Where a party cites no authority to support an argument, we may assume no such authority exists."); *State ex rel. Office of State Eng'r v. Lewis*, 2007-NMCA-008, ¶ 74, 141 N.M. 1, 150 P.3d 375 (citing cases stating that a party must submit argument and authority in order to present an issue for review on appeal, that we will not address a contention not supported by authority, and that an issue is abandoned upon a failure to present argument or authority).

### III. THE *BATSON* CHALLENGE

**{23}** In *Batson*, the United States Supreme Court held that racial discrimination in selecting a jury in a criminal case violates the Equal Protection Clause of the United States Constitution. 476 U.S. at 85. Racial discrimination not only violates the right of the defendant, it also unconstitutionally discriminates against the excluded juror, and undermines public confidence in the fairness of our system of justice. *Id*. at 86-87. *Batson* was subsequently extended to civil cases in *Edmonson*, 500 U.S. at 616-17, and in *J.E.B. v.*

*Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994), the Supreme Court held that "gender, like race, is an unconstitutional proxy for juror competence and impartiality." Discrimination in jury selection causes individualized and structural harm.

> Discrimination in jury selection, whether based on race or on gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process. The litigants are harmed by the risk that the prejudice that motivated the discriminatory selection of the jury will infect the entire proceedings. The community is harmed by the State's participation in the perpetuation of invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders.

*Id*. at 140 (citation omitted).

Thus, when even a single juror is stricken for racial reasons, reversible error is committed regardless of whether the jury that is chosen is actually fair and unbiased or retains its "representative" character, because equal protection has been violated. *See State v. Gerald B.*, 2006-NMCA-022, ¶ 30, 139 N.M. 113, 129 P.3d 149; *State v. Gonzales*, 1991-NMCA-007, ¶ 17, 111 N.M. 590, 808 P.2d 40, *modified on other grounds by State v. Dominguez*, 1993-NMCA-042, 115 N.M. 445, 853 P.2d 147.

**{24}**     Following *Edmonson*, we for the first time in New Mexico, hold that the *Batson* approach applies to civil cases. In this case, the district court allowed Defendants to use peremptory strikes against Hispanics from the jury with the result that the jury that decided the case had no Hispanics. We are therefore squarely confronted with Plaintiffs' argument that the jury selection violated *Batson*. We first describe the procedure which a district court must follow when a *Batson* challenge is made during jury selection, set forth our standard of review, then apply that analysis to the facts before us.

## A.     Procedure for Deciding a *Batson* Claim

**{25}**     In *Edmonson*, the Supreme Court stated that the same approach described in *Batson* for determining the existence of racial discrimination in the jury selection of criminal cases also applies in civil cases. *Edmonson*, 500 U.S. at 631. Our precedent in applying *Batson* in criminal cases is well developed. A three-part test is utilized.

**{26}**     First, the opponent of a peremptory challenge has the burden to establish a prima facie case "indicating that the peremptory challenge has been exercised in a discriminatory way[.]" *State v. Salas*, 2010-NMSC-028, ¶ 31, 148 N.M. 313, 236 P.3d 32. To establish a prima facie case the challenging party must show that "(1) a peremptory challenge was used to remove a member of a protected group from the jury panel, and (2) the facts and other related circumstances raise an inference that the individual was excluded solely on the basis of his or her membership in a protected group." *Id*.

7

**{27}** Second, if a prima facie showing is made, the burden then shifts to the proponent of the challenge to come forward with a race or gender-neutral explanation for the challenge. *Id.* ¶ 32. This does not require a persuasive or even plausible explanation. *Id.* While a mere denial of a discriminatory motive is not sufficient, *State v. Jones*, 1997-NMSC-016, ¶ 3, 123 N.M. 73, 934 P.2d 267, as long as a discriminatory intent is not inherent in the explanation, the reason offered is deemed to be neutral. *Salas*, 2010-NMSC-028, ¶ 32. If the explanation offered is not neutral, then a finding of purposeful discrimination may be made without any further showing by the opponent to the challenge. *Jones*, 1997-NMSC-016, ¶ 3.

**{28}** Third, if a neutral explanation is tendered, the district court then determines whether the opponent of the strike has proved purposeful discrimination. *Salas*, 2010-NMSC-028, ¶ 32. In this regard, the burden of persuasion on discrimination never shifts from the opponent of the strike. *Id*.

## B. Standard of Review

**{29}** We review a district court's factual findings on a *Batson* challenge under a deferential standard of review. *Id.* ¶ 33. In making its factual findings, the district court has a responsibility to " (1) evaluate the sincerity of both parties, (2) rely on its own observations of the challenged jurors, and (3) draw on its experience in supervising voir dire. " *Id* (internal quotation marks and citation omitted).

**{30}** However, the *Batson* issue ultimately is a constitutional one which we review de novo. *See Salas*, 2010-NMSC-028, ¶ 33. While factual, the issue is also one of policy to be decided de novo because the ultimate constitutional question relates to conduct. Our review is therefore similar to that invoked in instances in which there exist mixed questions of law and fact requiring this Court, as a policy matter, to review de novo issues that involve abstract legal doctrine and evaluative judgments but which are also inherently factual, such as issues of constitutional reasonableness. *See State v. Attaway*, 1994-NMSC-011, ¶¶ 6-10, 117 N.M. 141, 870 P.2d 103; Randall H. Warner, *All Mixed Up About Mixed Questions*, 7 J. App. Prac. & Process 101, 102 (2005).

**{31}** The standard of review analysis in *Gerald B.*, 2006-NMCA-022, ¶ 36, is incomplete insofar as it states that "we review the action of the trial court under a deferential standard[,]" if by that statement, *Gerald B.* means that the ultimate question of constitutional neutrality is not reviewed de novo. While *Batson* indicates that a district court's findings are to be given "great deference," *Batson*, 476 U.S. at 98 n.21, this does not eliminate de novo review of the constitutional propriety of the peremptory challenges. The conclusion as to the constitutional propriety of the peremptory challenges is still reviewed de novo. *See Jones*, 1997-NMSC-016, ¶ 11 (stating that "an appellate court need not defer to a trial court on whether a reason is constitutionally adequate"); *Bailey*, 2008-NMCA-084, ¶ 15 (same).

## C. Analysis

**{32}** Plaintiffs argue that equal protection was violated when the district court erred in allowing Defendants to use peremptory strikes against three Hispanic prospective jurors and a prospective alternate juror. Defendants respond by arguing that Plaintiffs cannot establish a prima facie case of discrimination and did not overcome Defendants' racially-neutral reasons for striking the prospective jurors.

**{33}** We first note that Hispanics are a cognizable group under a *Batson* challenge. *State v. Guzman*, 1994-NMCA-149, ¶ 19, 119 N.M. 190, 889 P.2d 225. Secondly, because the district court required Defendants to offer a race-neutral explanation for the strikes at issue, we conclude that the district court found that Plaintiffs made a prima facie case of discrimination against Hispanics. *See Bailey*, 2008-NMCA-084, ¶ 17 (observing that because the district court asked if the state had a race-neutral reason for its challenges, "[t]he district court therefore implicitly found that [d]efendant had made a prima facie showing that the State's challenges were racially motivated").

**{34}** Defendants used three of their five peremptory challenges against prospective jurors with Hispanic surnames, with two of those five challenges exercised against prospective jurors with Anglo surnames. Defendants also used their one peremptory strike against a prospective juror with a Hispanic surname. Plaintiffs objected on *Batson* grounds to Defendants' peremptory challenges against those with Hispanic surnames. The court required Defendants to explain the reasons for their peremptory challenges of jurors with Hispanic surnames. When the district court polled the jury at the conclusion of trial, there were no Hispanics on the jury. There is not any dispute over whether Plaintiffs established a prima facie case of discriminatory conduct in the exercise of peremptory challenges.

**{35}** We therefore determine whether Defendants satisfied their burden of providing a racially-neutral explanation for each peremptory strike. *See Gerald B.*, 2006-NMCA-022, ¶ 32 (concluding that because the state proceeded past the first step of the *Batson* analysis without questioning whether there was a prima facie showing, and the district court made findings on discrimination, it was proper to determine on appeal whether the state satisfied its burden to articulate a racially neutral explanation for its peremptory challenge); *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plur. opn. of Kennedy) ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."). We independently review defense counsel's explanations to determine if they were constitutionally adequate. *See Gerald B.*, 2006-NMCA-022, ¶ 28 (concluding that because a constitutional question is presented, we apply de novo review to the race-neutral explanations given for peremptory strikes).

### 1.      Juror No. 26

**{36}** On her juror questionnaire, Juror No. 26 identified herself as a Hispanic who speaks Spanish and English. Defendants used their first peremptory challenge to strike her from the

9

jury. Plaintiffs objected, stating that Defendants asked her no questions in voir dire and asserting that there was no basis for the strike. Responding to the district court's request for a racially-neutral explanation, counsel stated that "she is a nursing home caregiver." Plaintiffs' counsel challenged the reason as insufficient, but the district court ruled that the strike had a "reasonable basis." Subsequently, when Defendants accepted another juror to sit on the jury, Plaintiffs argued that she was also a caregiver, but defense counsel failed to strike her. *See Guzman*, 1994-NMCA-149, ¶ 20 (stating that when the same factors that were identified to strike Hispanics were not applied to strike Anglos, the explanation was not race-neutral). The juror who was accepted worked as an x-ray technician at the time of the trial. An x-ray technician manipulates medical imagery equipment in order to take pictures of the internal structures of the body. In contrast, a nursing home caregiver typically provides assistance to patients in aspects of daily living. Moreover, an x-ray technician may see her patients only once to capture an image while a nursing home caregiver may have daily interactions with her patients. We therefore agree with the district court that there is a distinction between the two occupations and affirm that Defendants' explanation was sufficiently race-neutral.

**{37}** Plaintiffs also argue for the first time on appeal that another juror who was chosen had experience as a caregiver. This juror's questionnaire states that at the time of trial she worked in retail at Goodwill and her past jobs included "working with people with disabilities[.]" We agree with Defendants that because Plaintiffs did not argue the similarity of the jobs between the juror who was stricken and the juror who sat, Plaintiffs cannot now make that argument for the first time on appeal. "To preserve an issue for review on appeal, it must appear that appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court." *Woolwine v. Furr's, Inc.*, 1987-NMCA-133, ¶ 20, 106 N.M. 492, 745 P.2d 717.

## 2. Juror No. 27

**{38}** Defendants used their third peremptory strike to remove Juror No. 27, who self-identified himself as "Mexican" on his juror questionnaire. Plaintiffs objected to the strike and when the district court asked for an explanation, defense counsel stated, "there are other people on this jury who are further down the line that I'd like." Defense counsel had not asked any individual questions of this juror, and Plaintiffs' counsel asserted this was not a sufficient reason. The district court nevertheless allowed the strike on the basis of the explanation given by defense counsel. We do not defer to the district court's determination in regard to Defendants' explanation of the challenge; instead under de novo review we hold that the district court's determination was erroneous.

**{39}** Defendants repeat on appeal that their underlying rationale for the challenge to Juror No. 27 "was that they had to sacrifice [Juror No. 27] so they could reach another juror who they believed would be favorable toward[] them." This underlying rationale is acceptable in the usual exercise of peremptory challenges where a prima facie case of discriminatory conduct has not been established. Absent a prima facie case of discriminatory conduct,

10

striking jurors tending to or perceived to be sympathetic with the opposing party's case, in hopes of getting a juror who is not so predisposed, has always been considered fair game and a virtually unchallengeable prerogative of counsel. Defendants' underlying rationale is not acceptable when a party has established a prima facie case of discriminatory conduct in the exercise of peremptory challenges. If a discriminatory intent is inherent in the reason for the challenge, the reason is not race-neutral. *See Salas*, 2010-NMSC-028, ¶ 32.

**{40}** *Batson* warned that the party making the strike does not rebut a prima facie case of discrimination "merely by denying that he had a discriminatory motive or affirming his good faith in making individual selections." *Batson*, 476 U.S. at 98 (alterations, internal quotation marks, and citation omitted). Instead, the party making the strike "must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges." *Id.* n.20 (internal quotation marks and citation omitted). "This warning was meant to refute the notion that a prosecutor could satisfy his burden of production by merely denying that he had a discriminatory motive or by merely affirming his good faith." *Purkett v. Elem*, 514 U.S. 765, 769 (1995) (per curiam); *see Miller-El v. Dretke*, 545 U.S. 231, 239 (2005) (reiterating that the striking party 'must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenge' (quoting *Batson*, 545 U.S. n.20)); *State v. Goode*, 1988-NMCA-044, ¶ 9, 107 N.M. 298, 756 P.2d 578 (stating that the party excusing jurors "must articulate a neutral explanation related to the particular case, giving a clear, concise, reasonably specific legitimate explanation for excusing those jurors").

**{41}** The reason must be sufficiently specific to allow the party challenging the strike to exercise its right "to refute the stated reason or otherwise prove purposeful discrimination." *Jones*, 1997-NMSC-016, ¶ 3. It must also be sufficiently specific to enable the district court to determine whether the opponent of the strike has proved purposeful discrimination and, therefore, to safeguard equal protection. *See Goode*, 1988-NMCA-044, ¶ 9 ("[T]he trial court may not merely accept the state's proffered explanations, but has a duty to examine them and decide whether they are genuine and reasonable."). As more fully explained by *State v. Giles*, 754 S.E.2d 261, 265 (S.C. 2014), in order for the explanation to be legally sufficient at the second step of the *Batson* analysis, the explanation

> must be clear and reasonably specific such that the opponent of the challenge has a full and fair opportunity to demonstrate pretext in the reason given and the trial court to fulfill its duty to assess the plausibility of the reason in light of all the evidence with a bearing on it. Reasonable specificity is necessary because comparison to other members of the venire for purposes of a disparate treatment analysis, which is often used at the third step of the *Batson* process to determine if purposeful discrimination has occurred, is impossible if the proponent of the challenge provides only a vague or very general explanation. The explanation given may in fact be implausible or fantastic, as noted in *Purkett*, but it may not be so general or vague that it deprives the opponent of the challenge of the ability to meet the burden to show, or the trial court of the ability to determine whether, the reason given

11

is pretextual. The proponent of the challenge must provide an objectively discernible basis for the challenge that permits the opponent of the challenge and the trial court to evaluate it.

*Id.*

Thus, numerous cases have concluded there was error at the second step of the *Batson* analysis where the reasons proffered for striking a juror were not sufficiently "clear and specific" in providing a factual basis for a court to review for legitimacy. *See Moeller v. Blanc*, 276 S.W. 3d 656, 662-63; 666 (Tex. Ct. App. 2008) (collecting cases and concluding that "obscure and vague" explanations for striking a juror are insufficient).

**{42}** What obviously overly tips the propriety balance of Defendants' peremptory challenge of Juror No.27 toward a discriminatory pattern is Defendants' having exercised their peremptory challenges against Hispanic-surnamed jurors in a manner that appears to have assured that no Hispanic-surnamed person would sit on the jury, and, as well, that the jury would not consist of a sufficient number of Hispanic jurors who might be prone to favor Plaintiffs. Defendants' actions had to have raised an eyebrow when, after the game was played, the field was laid bare of Hispanic jurors and the only basis for challenging Juror No. 27 was that Defendants wanted to have a juror that they believed would be favorable toward them.

**{43}** While Defendants' explanation of this challenge was race-neutral on its face, more was required. *See Giles*, 754 S.E.2d at 263, 265-66. Defendants did not examine the stricken jurors on voir dire in an effort to uncover information that would lead Defendants to be concerned about juror predisposition. There may have been proper, race-neutral reasons why Defendants wanted another juror "further down the line", but the record before us fails to disclose what those reasons might have been. We are therefore left without constitutionally permissible, race-neutral reasons for striking Juror No. 27. "If . . . general assertions were accepted as rebutting a defendant's prima facie case, the Equal Protection Clause would be but a vain and illusory requirement." *Batson*, 476 U.S. at 98 (internal quotation marks and citation omitted). Under the totality of circumstances, one can reasonably read Defendants' explanation to really say, "we struck [Juror No. 27] because, being Hispanic, he likely would favor Plaintiffs, and we preferred finding a non-Hispanic juror instead who would likely favor Defendants." We therefore hold that the district court erred in allowing Defendants to strike Juror No. 27.

### 3. Juror No. 36

**{44}** Defendants had previously attempted to strike Juror No. 36 for cause because they were worried her non-treated asthma would cause delay if she had an asthma attack during the trial. The district court denied the strike for cause. Defense counsel then used a peremptory challenge, and Plaintiffs' counsel objected, alerting the court that this would be the third potential Hispanic juror struck by Defendants. Defendants gave their explanation

and the court allowed the strike, reasoning that "it's an appropriate use of a peremptory to challenge a juror that you attempted to challenge for cause and were unable to get it done[.]"

**{45}** Plaintiffs argue that because Defendants were unable to strike Juror No. 36 for cause does not give rise to the appropriate use of a peremptory strike. We disagree. Race-neutral reasons for peremptory strikes do not need to rise to the same level needed to justify a challenge for cause. *State v. Sandoval*, 1987-NMCA-041, ¶ 15, 105 N.M. 696, 736 P.2d 501. Here, Defendants proffered a plausible race-neutral explanation; potential delay of trial from a potential juror's medical condition. We therefore affirm the district court's determination that a sufficient race-neutral explanation was given for striking Juror No. 36.

### 4.      Juror No. 40

**{46}** After the jury was picked, Juror Nos. 40 and 41 were next in line for selection as alternate jurors and both of them were Hispanic. When Defendants struck Juror No. 40, Plaintiffs objected, arguing this was the fourth Hispanic stricken, indicating a pattern, and when asked by the district court for an explanation for the strike, counsel responded that he was stricken because he was unemployed.

**{47}** Defendants urge us to conclude that because no alternate juror was called to deliberate on the case, that the harmless error standard is appropriate to apply. We reject this suggestion. If a prospective juror is stricken because of race, equal protection is violated, and the verdict must be reversed, notwithstanding that juror did not deliberate on the case. Likewise, if a prospective alternate juror is stricken because of race, equality is violated, whether or not that juror actually deliberates on the case. In both circumstances, the harm to our society and system of justice is identical, and it does not matter whether the jury that actually decided the case is 'representative' or unbiased. Our Constitution does not allow for such discrimination in the selection of our juries in civil or criminal cases.

**{48}** Nevertheless, we conclude that Defendants' explanation that Juror No. 40 was stricken because he was unemployed is sufficiently race-neutral in the circumstances of this case. Anticipating this conclusion, Plaintiffs for the first time on appeal suggest this was a pretext because one of the jurors who was actually seated was also unemployed. Because this was not brought to the attention of the district court, we do not consider it further. *Woolwine*, 1987-NMCA-133, ¶ 20.

**{49}** When viewed in the total selection process, Defendants' challenges indicate a pattern of conduct and a motive to keep Hispanics off of the jury. Cumulatively, the challenges teeter on the edge of impropriety.  The challenges carried a suspicious motivation of ridding the jury of Hispanics, leaving a distinct overview of distrust creating a prima facie case. When looking at the totality of the proceedings, it is reasonable to conclude that Defendants' explanation of the challenge to Juror No. 27 was not race-neutral and was pretextual.

**{50}** Defendants nevertheless argue that their five peremptory strikes should not give rise

13

to an inference of discriminatory intent because they also struck Anglo-surnamed jurors, indicating exclusion based on non-racial factors, and also because Plaintiffs exercised their five peremptory strikes against jurors with Anglo surnames, indicating a pattern of discrimination against jurors with Anglo surnames. These arguments do not change things. Defendants' actions are at issue here, not Plaintiffs' actions. Defendants' actions create strong inferences of discriminatory intent. While Plaintiffs' actions may as well, neither Defendants nor the district court raised a *Batson* issue in that regard.

**{51}**    The jury selection in this case violated *Batson*. The remedy for such a violation in a criminal case is a new trial. *Guzman*, 1994-NMCA-149, ¶ 20. The same remedy applies in a civil case. *See*, *e.g.*, *Woodson v. Porter Brown Limestone Co.*, 916 S.W. 2d 896, 907 (Tenn. 1996); *Moeller*, 276 S.W. 3d at 666; *Davis v. Fisk Elec. Co.*, 268 S.W. 3d 508, 526 (Tex. 2008). The verdict of the jury is reversed and the case is remanded to the district court for a new trial.

## IV.    REMAINING ARGUMENTS

**{52}**    Plaintiffs contend that the district court erred in directing the verdict of the jury in Defendants' favor on the battery claim against the individual police officers. We agree. Looking at the facts recited herein alone, and they were not the only facts offered in support of the claim, we conclude that the district court erred. *See Selmeczki v. N.M. Dep't of Corr.*, 2006-NMCA-024, ¶ 29, 139 N.M. 122, 129 P.3d 158 ("It is black-letter law that causing an offensive touching, even indirectly to another's clothing and not resulting in injury, is the tort of battery."); Restatement (Second) of Torts § 18 (1965) (stating that an actor is liable for battery if "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results"); *see also Strickland v. Roosevelt Cnty. Rural Elec. Coop.*, 1980-NMCA-012, ¶ 14, 94 N.M. 459, 612 P.2d 689 ("[D]irected verdicts are not favored and should be granted only when the jury could not reasonably and legally reach any other conclusion.").

**{53}**    Defendants argue for the first time on appeal that an intentional tort such as battery does not survive the death of a decedent when the death is unrelated to the tort. We do not address this argument, as it was not presented to the district court. *See Woolwine*, 1987-NMCA-133, ¶ 20.

**{54}**    We do not address the remaining issues raised by Plaintiffs because those issues may not reoccur at the re-trial. In addition, those issues identified as issues Nos. 5, 6, 7, 8, 10, and 11 in Plaintiffs' brief in chief were not briefed, and we do not address them. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 (stating that issues that are unsupported by any cited authority will not be addressed on appeal and that the appellate court will not do this research for counsel).

## V.    CONCLUSION

14

**{55}**     The summary judgment and jury verdict in favor of Defendants are reversed, and the cause is remanded to the district court for a new trial in accordance with this Opinion.

**{56}     IT IS SO ORDERED.**

_____
**MICHAEL E. VIGIL, Chief Judge**

**WE CONCUR:**

_____
**JONATHAN B. SUTIN, Judge**

_____
**RODERICK T. KENNEDY, Judge**